IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

LAURA J. GRANT                                                         PLAINTIFF

V.                       CIVIL NO. 3:14-cv-03050-TLB-MEF

CAROLYN W. COLVIN, Acting Commissioner,
Social Security Administration                                      DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Laura J. Grant, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for a period of disability, disability insurance benefits (DIB), and supplemental security income (SSI) under the provisions of Titles II and XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I. Procedural Background**

Plaintiff protectively filed applications for DIB and SSI on January 25, 2012, alleging disability since August 1, 2007, due to: heart problems, hyperlipidemia, hypertension, bipolar disorder, anxiety, depression, and obsessive compulsive disorder. (Tr. 14, 236) For DIB purposes, Plaintiff has insured status through December 31, 2016. (Tr. 16) An administrative hearing was held on February 12, 2013, at which Plaintiff appeared without counsel and testified. (Tr. 31-101)

By a written decision dated March 22, 2013, the ALJ found Plaintiff had the following severe impairments: "coronary artery disease, status post coronary artery bypass grafting (CABG); mood disorder; anxiety disorder; and substance addiction disorder. (Tr. 16) After reviewing all of the

evidence presented, the ALJ determined Plaintiff's impairments did not meet or equal the level of severity of any impairment in the Listing of Impairments. (Tr. 17-18) The ALJ found Plaintiff residual functional capacity (RFC) to perform light work except:

> the claimant can perform simple, routine, repetitive tasks in an environment where interpersonal contact is limited and only incidental to the work performed and the supervision required is simple, direct and concrete. (Tr. 16)

With the help of a vocational expert (VE), the ALJ determined Plaintiff could perform her past relevant work (PRW) as a housekeeper and appointment clerk. (Tr. 23) Based on the VE's testimony, the ALJ also determined Plaintiff could perform the requirements of the representative occupations of silver wrapper and office clerk. (Tr. 24) The ALJ then found Plaintiff had not been under a disability as defined by the Act during the relevant time period. (Tr. 25)

Plaintiff next requested a review of the hearing decision by the Appeals Council, which denied the request on March 6, 2014. (Tr. 1-4) Subsequently, Plaintiff filed this action on May 8, 2014. (Doc. 1) Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (Docs. 13, 14)

**II. Evidence Presented**

Plaintiff had a myocardial infarction in May 2007 after injecting methamphetamine, and had a stent implanted. (Tr. 345, 491-493, 496-497) On discharge, Plaintiff was prescribed Plavix, asprin, atenolol, and Prevastatin. (Tr. 493) Plaintiff returned to the White County Medical Center ER later in the month under the influence of methamphetamine and alcohol. She was assessed with chest pain and an anxiety attack, but abruptly left the ER. (Tr. 487-489) In December 2007, Plaintiff was treated at the Baptist Health ER in North Little Rock, Arkansas, for chest pains after she stopped taking Plavix, but left in the middle of treatment. (Tr. 514-515, 521-522, 530-531)

On March 20, 2008, Plaintiff sought treatment at the White County ER for chest pains. (Tr. 450) An EKG showed sinus tachycardia and left atrial enlargement, and records noted Plaintiff was still smoking cigarettes and using methamphetamine. (Tr. 455-456) A CT scan and chest x-ray ruled out a heart attack, but revealed congestive changes and infiltrates in Plaintiff's chest. (Tr. 477-478) Plaintiff was assessed with pneumonia and methamphetamine withdrawal. (Tr. 450-451, 456, 477) In October 2008, Plaintiff sought treatment for a pregnancy and chest pains. (Tr. 319, 357-359) A pulmonary embolism was ruled out, and Plaintiff was diagnosed with pneumonia. (Tr. 444-445)

On November 6, 2008, Plaintiff was treated at the Baptist Health ER for chest pains, and she was released with a referral to a perinatologist. (Tr. 518-519, 532-533)

On December 18, 2008, Plaintiff returned to the White County ER where she was assessed with pneumonia and prescribed antibiotics. (Tr. 422, 433, 436) Plaintiff underwent a stress test on December 22, 2008, which was normal. (Tr. 347)

On July 1, 2009, Plaintiff saw Dr. Valerie McNee at the Arkansas Heart Center and reported she had occasional chest, arm, and shoulder pain when she "overdoses on physical activity," although nitroglycerin helps. (Tr. 523-524) Plaintiff also reported she had recently completed Prometa, a drug treatment program where she received injections targeting her GABA receptors, and was taking flumazenil for her methamphetamine cravings, although she had only been in remission about one week. (Tr. 524) Medications were listed as aspirin, Chantix, metoprolol, nitroglycerin, a prenatal vitamin, and simvastatin. (Tr. 525) Plaintiff reported she was not using alcohol, was smoking about a pack each day, and was experiencing decreased exercise tolerance and pain in her legs and joints. (Tr. 524) Plaintiff was cooperative and oriented, and her exam was normal. (Tr. 525) Dr. McNee assessed Plaintiff with underlying atherosclerosis that was "not just an acute drug related

event," found Plaintiff's symptoms suspicious for exertional angina, suggested her past ventricular function indicated ischemic cardiomyopathy, and noted Plaintiff's history indicated obsessive compulsive disorder and hyperlipidemia. (Tr. 525) Plaintiff was instructed to start using her Chantix prescription, and undergo an echocardiogram and stress test. (Tr. 525-526)

On July 31, 2009, Plaintiff underwent a cardiac catheterization and angiogram, which showed "diffuse, but mild atherosclerotic coronary artery disease." (Tr. 538-539)

Plaintiff was seen by Dr. Jeffrey Rains, a psychiatrist, on August 31, 2009. (Tr. 392) Dr. Rains assessed Plaintiff with borderline personality disorder and assigned a GAF of 56. (Tr. 392-393) Dr. Rains noted Plaintiff continued to use methamphetamine and was non-compliant with taking her medications. (Tr. 390-391)

Plaintiff was admitted at the White County ER on April 12, 2010, with a complaint of chest pain. (Tr. 396) Her physical exam was normal, and Plaintiff was prescribed nitroglycerine for her chest pain. (Tr. 397-402) Dr. Nuri Akkus, a cardiologist, examined Plaintiff. He noted Plaintiff was non-compliant with taking Plavix and Depakote, but she was smoking one pack and using methamphetamine each day. (Tr. 405-406) Plaintiff underwent a chest x-ray and electrocardiogram, which were normal, but a cardiac catheterization showed "borderline mid LAD lesion" and angiogram showed an ejection fraction of 35 to 40-percent. (Tr. 410, 414-415) Dr. Akkus recommended a stress test if Plaintiff's angina persisted once she re-established medications and eliminated methamphetamine. (Tr. 415) Plaintiff was also seen by Dr. Rains, who assessed her with borderline personality disorder (with rapid cycling), methamphetamine dependance, and a GAF of 58. (Tr. 387-388) During her visit, Dr. Steve Collier also assessed Plaintiff with heart disease, unstable angina, hypertension, panic disorder, anxiety disorder, bipolar disorder, hyperlipidemia,

hypercholesterolemia, and tobacco use disorder. (Tr. 410) In-patient psychiatric treatment was recommended, and Plaintiff was instructed to stop smoking and follow-up with Dr. Akkus and Dr. Collier within the month. (Tr. 411-412)

On April 2, 2011, Plaintiff was treated at the Baptist Health ER for chest pains after using methamphetamine. (Tr. 516, 527-528, 534-537) A heart attack was ruled out, but chest x-rays showed a "somewhat prominent" aortic arch, and a cardiac catheterization showed significant underlying coronary artery disease. (Tr. 516, 581) An echocardiogram showed an ejection fraction of 55-percent, but coronary artery disease. (Tr. 594) Dr. John Colleran recommended bypass surgery, which Plaintiff rejected. (Tr. 516) Dr. Colleran instructed Plaintiff to follow-up with treatment, made prescriptions available, and recommended she avoid any strenuous work, and stop smoking. (Tr. 516-517)

Plaintiff had a follow-up at Baptist Health on April 14, 2011, and reported her chest pain had resolved, but she appeared manic, although stable enough for admission to psychiatric. (Tr. 596-597) Chest x-rays and head CT were normal. (Tr. 606-607) Plaintiff rejected further treatment and "eloped with her IV intact." (Tr. 600-601)

On April 20, 2011, Plaintiff was admitted to the Mercy Hospital ER in Springfield, Missouri, for chest pain and dizziness. (Tr. 644) Plaintiff's behavior, thought content, and judgment were normal and she was discharged with a prescription for nitroglycerin. (Tr. 645, 648) Notes indicate Plaintiff needed to leave so she could go to work. (Tr. 652)

Plaintiff was next treated in January 2012 after using methamphetamine. (Tr. 611, 618) A cardiac catheterization was performed on January 19, which showed a myocardial infarction, coronary artery disease (high grade stenosis of 80 to 90-percent), and an ischemic cardiomyopathy

(ejection fraction of 40-percent). (Tr. 615-616) Her previous stent was reopened and restented. (Tr. 618, 664)

On February 8, 2012, Plaintiff saw Dr. K. Fon Huang, who noted Plaintiff was experiencing cold sweats and other symptoms of heart problems, but did not have any "obvious increasing exertional symptoms of a class angina, dyspenea, or palpitations." (Tr. 664) Plaintiff reported she was a chronic smoker and had used methamphetamine once since her most recent hospitalization. (Tr. 665) Dr. Huang reviewed Plaintiff's cardiac catheterization, noting her ejection fraction was 40-percent. (Tr. 665) He recommended a single bypass surgery, and Plaintiff agreed to proceed with a MIDCAB procedure. (Tr. 665-666) On February 23, 2012, Plaintiff underwent a successful "minimally invasive coronary artery bypass graft" operation at Mercy Hospital. (Tr. 668-670) On February 26, 2012, Plaintiff left the hospital before completing her inpatient recovery against medical advice. (Tr. 671, 714-715) Plaintiff then checked into a hospital in Springdale, Arkansas, where she was treated for chest pains and had a drain removed. (Tr. 671, 715)

On March 8, 2012, Plaintiff was admitted at Mercy Hospital for chest pains after using methamphetamine and attempting to lift a piece of asphalt. (Tr. 680-681) An EKG showed no changes from her post-operation EKG and her cardiac enzymes were within normal limits. (Tr. 680) Plaintiff was discharged with instructions to not lift more than ten pounds until she healed from surgery and to avoid street drugs. (Tr. 680) On May 11, 2012, Plaintiff returned to Mercy Hospital with complaints of chest pain and shortness of breath. (Tr. 749) Chest x-rays and an echocardiogram were negative, and, according to Dr. Marcus Causey, her pain was likely musculoskeletal and not heart related. (Tr. 753) Plaintiff was prescribed atenolol and a nicotine patch, and instructed to follow a heart healthy diet and see a mental health provider. (Tr. 753-754) After repeatedly leaving

and reentering the hospital, Plaintiff signed herself out against medical advice. (Tr. 756-757) Dr. Kristin Griffin declined to prescribe medications because Plaintiff was positive for methamphetamine and instructed her to follow-up with a primary care physician. (Tr. 757)

On June 20, 2012, Plaintiff was examined by W. Charles Nichols, a State psychiatrist. (Tr. 764-769) Plaintiff reported suffering from OCD for at least thirty years and described obsessive compulsive cleaning rituals such as not being able to leave her home until all the dishes were in place. (Tr. 764) She also shared having bipolar traits like a concern for how others perceived her, low confidence, disrupted sleep, trouble focusing on one task, and excessive energy. (Tr. 764) Plaintiff's only reported mental health treatments were her sessions with Dr. Rains, and she was not taking any medications. (Tr. 764-765) Plaintiff revealed she performs all her chores in a timely manner; shops independently; drives all the time without problems navigating; has frequent social interactions; has past problems interacting with coworkers, but never leading to termination; and no methamphetamine use since February 2012, but a pack per day tobacco habit. (Tr. 765)

Dr. Nichols noted Plaintiff was cooperative and engaged with normal affect, speech, and cognition. (Tr. 766-767) Plaintiff's thought process, however, was somewhat tangential and she was hyper talkative. (Tr. 766). Dr. Nichols addressed Plaintiff's onset of elevated mood episodes and opined they were late onset for bipolar disorder and occurred with heavy drug use. (Tr. 768) He concluded, "due to the possible role that activating substances have played in her mood instability, mood disorder NOS is the most appropriate diagnosis," and also assessed Plaintiff with obsessive compulsive disorder, cocaine dependence (full remission, per claimant only), and methamphetamine dependence (early remission, per claimant only). (Tr. 768) Dr. Nichols assigned Plaintiff a GAF of 60 and opined she had a mild impairment in her ability to perform daily activities; her mood

instability and related drug use would negatively impact her capacity to interact appropriately with others; she had average cognitive abilities and mental efficiency in the context of meeting the demands of basic work like activities; her mental status performance suggested no prominent attention disruption; her attention to detail and response quality were adequate; and she had average pace. (Tr. 768)

Dr. David Neale, a State non-examining physician, completed a physical RFC assessment dated June 22, 2012, and opined Plaintiff could occasionally lift or carry twenty pounds and frequently lift ten pounds; stand, sit, or walk about six hours each in an eight hour workday; push or pull without limitations; and had no postural, manipulative, visual, environmental, or communicative limitations. (Tr. 775-779) Dr. Neale addressed Plaintiff's noncompliance with prescriptions and physician instructions, and concluded Plaintiff could perform light work. (Tr. 781)

On June 25, 2012, Dr. Christal Janssen, a State non-examining psychiatrist, submitted a mental RFC assessment and found Plaintiff had no marked mental limitations; mild limitations in performing the activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 787, 799) Dr. Janssen opined Plaintiff's "limitations arise from polysubstance dependence, mood disorder, and obsessive compulsive disorder," but she has "no remarkable mental limitations ... and receives no formal mental health treatment or medications at this time ... though mood symptoms are likely to cause some limitations, the claimant does not appear precluded from all employment." (Tr. 788) Dr. Janssen concluded the overall evidence suggests Plaintiff can perform work where interpersonal contact is limited. (Tr. 788)

On October 4, 2012, Dr. Ramona Bates, a State non-examining physician, submitted a physical RFC assessment and affirmed Dr. Neale's opinion. (Tr. 808) Dr. Susan Daugherty, a State non-examining psychiatrist, affirmed Dr. Janssen's mental RFC assessment on October 8, 2012. (Tr. 812)

### III. Applicable Law.

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001);

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(c). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require the application of a five-step sequential evaluation process to each claim for disability benefits. *See* 20 C.F.R. § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her RFC. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. §§ 404.1520, 416.920 (2003).

## IV. Discussion

On appeal, Plaintiff argues the ALJ: (1) did not perform a function-by-function analysis; (2) did not pose a properly phrased hypothetical to the VE; (3) erred by determining Plaintiff could perform her PRW; and, (4) erred by finding, in the alternative, Plaintiff could perform other jobs at step five. (Doc. 13, pp. 3-9)

### A. RFC

Plaintiff contends Social Security Regulation (SSR) 96-8p requires a function-by-function analysis before an RFC can be expressed in terms such as sedentary, light, or medium. (Doc. 13, p. 4)

According to SSR 96-8p, "the RFC assessment must first identify the individual's functional limitations . . . and assess his or her work-related abilities on a function-by-function basis." A function-by-function assessment of the individual's limitations or restrictions prevents an ALJ from

overlooking some of an individual's limitations. SSR 96-8p.[1] After the ALJ has assessed limitations on a function-by-function basis, the RFC may be expressed in terms of the exertional levels, such as light. *Id.*

As Defendant points out, there is "a distinction between what an ALJ must consider and what the ALJ must articulate in the written opinion." (Doc. 14, p. 5) SSR 96-8p requires an ALJ to consider all relevant evidence, and then explain how the evidence supports his conclusions in a narrative description. It does not require the ALJ to discuss every possible functional limitation. *See Biggs v. Astrue*, No. 11-3066 2012 U.S. Dist. LEXIS 119354 at *21-23 (W.D. Ark. Aug. 23, 2012); *see also Depover v. Barnhart*, 349 F.3d 563, 567 (8th Cir. 2003) (holding no violation of SSR 96-8p where ALJ made explicit findings in the RFC assessment, despite not making explicit findings with respect to sitting, standing, and walking). A review of the ALJ's decision shows the ALJ complied with SSR 96-8p. The functions addressed by the ALJ's RFC assessment were the ones where the ALJ found a limitation, and the functions omitted were those the ALJ found were not limited.

The undersigned has also reviewed the record and finds it supports the ALJ's RFC determination. Dr. Nichols suggested Plaintiff could cope with basic work tasks and had adequate concentration, persistence, and pace, although she had some problems with social interaction. (Tr. 768) The consulting physicians opined Plaintiff could perform light work in situations where interpersonal contact was limited. (Tr. 781, 788, 808, 812) Plaintiff's lifestyle included normal daily activities and chores such as driving, shopping, washing dishes, and mowing the lawn. (Tr. 68, 261-

---

[1] For example, limitations such as the ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, crouch, understand, remember, carry out instructions, respond appropriately to supervisors, co-workers, and work pressures, or tolerate certain environments may reduce an individual's ability to work. 20 C.F.R. § 404.1545(b)-(c).

268, 764-765) Her daily activities coupled with her self-employment as a housekeeper (making more than $14,000 in 2012) strongly supports the conclusion that she is not disabled. (Tr. 56-58, 220-229) This is substantial evidence to support the ALJ's determination. *See Melton v. Apfel,* 181 F.3d 939, 941-942 (8th Cir. 1999). Accordingly, the undersigned finds the ALJ's RFC determination is based on substantial evidence.

**B. Hypothetical Question**

Plaintiff also argues the ALJ posed an improper hypothetical question to the VE because it described Plaintiff's mental impairments in boilerplate terms of "simple, routine, and repetitive work." (Doc. 13 at 5) Plaintiff supports her argument with citations to courts in other circuits. *See e.g., Stewert v. Astrue*, 561 F.3d 670, 685 (7th Cir. 2009)(stating a hypothetical of "simple, routine tasks that do not require constant interactions with coworkers or the general public" does not account for concentration, persistence, or pace limitations). As Defendant points out, however, the Eighth Circuit has affirmed RFC determinations with the language used by the ALJ. *See Welsch v. Colvin*, 765 F.3d 926, 928 (8th Cir. 2014). The only Eighth Circuit case cited by Plaintiff, *Newton v. Chater*, 92 F.3d 688 (8th Cir. 1996), is a widely distinguished case. *See e.g., Hall v. Astrue*, No. 11-2138, 2012 WL 2049454 at *8 (W.D. Ark. June 6, 2012). In *Newton*, the Court concluded the ALJ's hypothetical, which described a hypothetical person as limited to "a capacity for simple jobs" did not adequately account for concentration, persistence, or pace limitations because it did not prompt the VE to remember or consider any of Plaintiff's specific deficiencies. 92 F. 3d at 694-695. In this circuit, Courts have found the ALJ's RFC terms adequately capture a claimant's deficiencies in concentration, persistence, or pace. *See e.g., Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001); *see also Hulsey v. Astrue*, 622 F.3d 917, 922-925 (8th Cir. 2010) (holding hypothetical

restricting claimant to "work of an unskilled nature involving only superficial interpersonal contact," accounted for Plaintiff's mental impairments of anxiety, depression, and borderline intellectual functioning).

> The ALJ posed the following hypothetical question to the VE:
>
> "If you have a hypothetical individual same age, education, past work as [Plaintiff] and if that hypothetical individual [is] limited to light work ... and further is limited to work where interpersonal contact is incidental to the work performed such as assembly work; the complexity of tasks is learned and performed by rote; with few variables, use of little judgment; the supervision required is simple, direct, and concrete; or, again, that's normally equated with unskilled work. Or to state in a different way, the state agency doctors found that – assume the hypothetical individual would be able to perform simple, routine, repetitive tasks where they said interpersonal contact is limited; so simple, routine, repetitive tasks with occasional interpersonal contact with coworkers, supervisors, general public, and simple, direct[,] concrete supervision. So do you think that hypothetical individual could perform any of [Plaintiff's] past work?" (Tr. 90-91)

The hypothetical set forth the impairments the ALJ accepted as true and which were supported by the record as a whole. In response, the VE testified Plaintiff could perform her past work as a housekeeper and appointment clerk, but not as a childcare worker. (Tr. 91-92) The ALJ then asked the VE to identify other light level jobs consistent with the hypothetical. (Tr. 92) The VE testified Plaintiff could perform the representative occupations of silver wrapper and office clerk. (Tr. 92) The VE's testimony constitutes substantial evidence. *See Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005).

Based on the foregoing, the undersigned finds no error in the ALJ's hypothetical question.

**C. Step Five**

Plaintiff next argues the ALJ erred by finding Plaintiff could perform other work at step five, after finding Plaintiff could perform her past work as a housekeeper and appointment clerk at step

four. According to Plaintiff, the regulations do not allow for alternative findings.[2] Plaintiff also contends the jobs recommended by the VE and adopted by the ALJ were inappropriate. (Doc. 13, p. 8)

Alternative findings at step four and step five are permissible, and an "ALJ may properly deny benefits at more than one step of the sequential analysis." *Barton v. Apfel*, 187 F.3d 640; No. 98-2484, 1999 WL 314127 at *2 (8th Cir. 1999)(unpublished opinion); *see also Julian v. Colvin*, No. 13-2167, 2015 WL 1257790 at *10 (E.D. Mo. Mar. 18, 2015)(stating alternative findings are appropriate). Alternative findings are not only permissible, but encouraged to conserve agency and judicial resources. *Id.*; *see also Murrell v. Shalala*, 43 F.3d 1388, 1389 (10th Cir. 1994)("the use of alternative dispositions generally benefits everyone: ...").

As for the jobs recommended by the VE at step five, Plaintiff is correct the appointment clerk job is a semi-skilled job according to the Dictionary of Occupational Titles (DOT), but it was described as an unskilled job by the VE and the ALJ. (Tr. 24, 92). Since the conflict was not addressed, the job was inappropriate. Any error was harmless, however, because the ALJ determined Plaintiff could perform her past work at step four and identified at least one job at step five matching the hypothetical and Plaintiff's RFC. *See Brueggemann v. Barnhart*, 348 F.3d 689, 695-696 (8th Cir. 2003)(stating an error is harmless when "the ALJ would have reached the same decision denying benefits" even absent the error).

Accordingly, the undersigned finds no basis for remand at step five.

---

[2] Plaintiff does not cite any cases to support her belief an ALJ is prohibited from making an alternative finding at step five.

### V. Conclusion:

For the reasons and upon the authorities discussed above, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 10th day of June, 2015.

/s/ *Mark E. Ford*
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE